**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| BETTY JO HIRSCHFIELD-LOUIK, DMD, t/a UPTOWN DENTAL, individually and on behalf of others similarly situated, et al., | ) ) ) ) | |
| Plaintiffs, | ) ) | 2:20-cv-00816 (Lead Case) 2:20-cv-01238 |
| v. | ) ) | 2:20-cv-01245 2:20-cv-01261 |
| CINCINNATI INSURANCE COMPANY, et al., | ) ) ) | 2:20-cv-01266 2:20-cv-01727 *2:21-cv-00386 |
| Defendants. | ) ) | *2:21-cv-00604 |
| (Applies to all Member Cases) | ) | Chief Judge Mark R. Hornak |

**AMENDED OPINION**

**Mark R. Hornak, Chief United States District Judge**

I.     **INTRODUCTION**

Plaintiffs in this case consist of dental practices, restaurants, minor league baseball operations organizations, and a salon, all of whom bring claims against their commercial property insurance carrier—The Cincinnati Insurance Company ("Cincinnati")[1]—alleging that Cincinnati wrongfully denied them coverage for claims stemming from the global coronavirus pandemic (referred to herein as COVID-19). Pending before the Court is Cincinnati's Motion to Dismiss Plaintiffs' claims pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 95). As this Court explained in its Opinion granting the defendants' Motion to Dismiss in *In re: Erie COVID-19 Business Interruption Protection Insurance Litigation*—a multidistrict litigation (MDL) consisting

---

[1] Defendants Cincinnati Casualty Company and Cincinnati Indemnity Company are wholly owned subsidiaries of Defendant Cincinnati Insurance Company. (ECF No. 88 ¶ 18.) The Court uses "Cincinnati" in this Opinion to refer to all Defendants.

*Case numbers incorrectly identified on original Opinion. Correcting the involved docket numbers is the only amendment made by this Opinion. Therefore, this Opinion does not apply to the civil actions at 2:20-cv-386 and 2:20-cv-604 as noted in the original document.

of over 30 cases brought by policyholders of Erie Insurance Group based on nearly identical claims as Plaintiffs' claims here—the types of claims that Plaintiffs assert are far from unique, as they mirror those asserted by business owners in thousands of similar cases nationwide. Opinion at 1–3, *In re: Erie COVID-19 Business Interruption Protection Insurance Litigation*, No. 21-mc-1 (W.D. Pa. Oct. 14, 2022) (hereafter "Erie Opinion").

Plaintiffs allege that starting in March 2020, they began to suffer significant financial consequences when they reduced their business operations or temporarily closed their businesses altogether following the outbreak of the global coronavirus pandemic (referred to herein as COVID-19), which has been one of the most serious public health events in history with devastating consequences across all aspects of life, including the loss of life itself. Plaintiffs filed insurance claims for their business losses with Cincinnati under the commercial property insurance policies Plaintiffs had purchased from it. Cincinnati denied those claims. The resulting lawsuits that Plaintiffs filed are eight of a multitude of actions in state and federal courts in which property owners with commercial insurance policies with Cincinnati and other carriers have alleged that their property insurers wrongfully denied COVID-19-related claims covered by their policies.

Against that backdrop and the law that has developed in this arena over the past two-plus years, the Court is not short of guidance from the parties and from the decisions of other courts as to how it should resolve the issues of law that this case raises. In the Erie Opinion, the Court analyzed those issues of law and how the law as it has developed applies to claims by policyholders in the MDL, which mirror Plaintiffs' claims here. Based on the Court's analysis and reasoning articulated in the Erie Opinion and as highlighted below, the Court will GRANT Cincinnati's Motion to Dismiss (ECF No. 95).

## II.      **PROCEDURAL BACKGROUND**

Beginning in 2020, all Plaintiffs in this case initially filed individual actions against Cincinnati. On November 23, 2020, this Court consolidated five of those actions because it concluded that the actions raised sufficiently common questions of law and that consolidation would further sound administration of justice in those actions. (ECF No. 36.) As to all then-pending motions in those five actions, the Court ordered that the moving party refile those motions at the docket number of the consolidated case (*id.*), which resulted in multiple pending Motions to Dismiss at the consolidated docket number (*see* ECF Nos. 18, 37, 40, 44, 49). On May 14, 2021, the parties notified the Court that Cincinnati and Plaintiffs in two other actions against Cincinnati before this Court sought to have those actions consolidated with those in this case. (ECF Nos. 79, at 3; 80, at 1.) And on August 25, 2021, the Court consolidated those two actions, as well as one other similar action against Cincinnati before the Court, with those in this case. (ECF No. 85.)[2]

Prior to the Court's August 25, 2021 consolidation Order, the Court also noted the approach that the Court had taken in its oversight of the multidistrict litigation in *In re: Erie*, namely giving Plaintiffs in the actions already consolidated in this case and those that wished to have their actions consolidated the opportunity to file a Consolidated Amended Complaint ("CAC") if all Plaintiffs (1) desired to do so, (2) agreed that the CAC would serve as the operative complaint moving forward, and (3) agreed to not seek further leave to amend absent a change in intervening, controlling law, or the discovery of facts not previously knowable. (ECF Nos. 81, at 1; 81-1, at 9.) All Plaintiffs in the consolidated and yet-to-be consolidated actions in this case requested to move forward with a CAC, but noting that while Plaintiffs did not anticipate seeing leave to make any

---

[2] Thus, the actions are consolidated at 2:20-cv-816, and the "member cases" are those at the following case numbers filed against The Cincinnati Insurance Company (with Plaintiffs indicated in parentheses): 20-cv-816 (Hirshfield-Louik), 20-cv-1238 (Covatto), 20-cv-1245 (2 Tomato, Inc.), 20-cv-1261 (Berg Dental Offices PC), 20-cv-1266 (Gottlieb), 20-cv-1727 (Sports/Facility LLC), 21-cv-386 (Fifty First Street LLC), and 21-cv-604 (Walborn).

further amendments, they "were not able" to disclaim doing so. (ECF No. 84, at 1–2.)

Plaintiffs filed their CAC (ECF No. 88) on October 7, 2021. In it, Plaintiffs assert two claims for relief: (1) declaratory relief for Plaintiffs and class members in the form of a declaratory judgment that Plaintiffs' asserted business interruption losses are covered under their Cincinnati commercial insurance policies (Count One); and (2) relief on behalf of Plaintiffs and class members for Cincinnati's alleged breach of contract in failing to provide claimed coverage under Cincinnati's insurance policies. (ECF No. 88, ¶¶ 126–48.)[3]

On December 23, 2021, Defendants filed the pending Motion to Dismiss pursuant to Federal Rule of Civil Procedure 12(b)(6) (ECF No. 95) and a brief in support of their Motion (ECF No. 96). Plaintiffs filed their Brief in Opposition to the Motion to Dismiss on January 27, 2022 (ECF No. 99), and Defendants filed their Reply Brief on February 28, 2022 (ECF No. 103). Oral argument as to the Motion to Dismiss occurred on May 16, 2022 (ECF No. 110).[4] The parties have also filed various Notices of Supplemental Authority (ECF Nos. 104, 111, 112, 114) while the present Motion to Dismiss has been pending.

The Motion to Dismiss is now ripe for disposition.

---

[3] Plaintiffs seek to assert these claims individually and as a class action on behalf of both a "Declaratory Judgment Class"—*i.e.*, "[a]ll policyholders in the United States who purchased commercial property coverage, including business income coverage from [Cincinnati]"—and a "Breach of Contract Class"—*i.e.*, "[a]ll policyholders in the United States who purchased commercial property coverage, including business income coverage[,] from [Cincinnati] and who have been denied coverage under their policy for lost business income after being ordered by a governmental entity to shut down or otherwise curtail or limit in any way their business operations, or who had to shut down or otherwise curtail or limit in any way their business operations in response to the COVID-19 pandemic." (ECF No. 88 ¶ 117.)

[4] The Court combined the oral argument on the Motion to Dismiss the actions in this consolidated case with oral argument on the Motions to Dismiss the actions contained within the *In re: Erie* multidistrict litigation and the Motions to Dismiss in two other COVID-19 business interruption insurance cases on the Court's docket (*Zunino v. Sentinel Insurance Co.*, No. 20-cv-1260, and *Taiclet v. Transportation Insurance Co.*, No. 20-cv-1552), all of which involve facts and issues of law common with, or at least similar to, those involved here. (ECF No. 102.) At oral argument, Plaintiffs in the *Hirschfield-Louik*, *In re: Erie*, *Taiclet*, and *Zunino* actions argued as a group, as did Defendants in all of those actions, and the parties identified for the Court any arguments that pertained only to specific actions.

### III.   <u>FACTUAL BACKGROUND</u>[5]

#### a.   <u>The Insurance Policies</u>

Plaintiffs collectively consist of several businesses—including dental practices, restaurants, minor league baseball operations organizations, and a salon—all located in Pennsylvania. (ECF No. 88 ¶¶ 6–17.) At the times relevant to these actions, "Plaintiffs each had a contract of insurance with [Cincinnati]"—collectively, the "Policies"—"all of which provided substantially identical business income loss coverages." (*Id.* ¶ 23.)

The Policies generally provide that Cincinnati "will pay for direct 'loss' to Covered Property at the 'premises' caused by or resulting from any Covered Cause of Loss." (ECF No. 89-1, at 30.)[6] "Loss" wherever used in the Policies is defined as "accidental physical loss or accidental physical damage" (*id.* at 65), and "covered cause of loss" means "direct 'loss' unless the 'loss' is excluded or limited" by the Policies (*id.* at 32). Applying these definitions, the Policies cover "direct," "accidental," and "physical" "loss," or "direct," "accidental," and "physical "damage," unless the cause of the "loss" or "damage" is "excluded or limited."

Several specific types of coverage under the Policies are relevant here. The first type is "business income," which covers a policyholder's "actual loss of 'Business Income' and 'Rental Value' [] sustain[ed] due to the necessary 'suspension' of [the policyholder's] 'operations' during the 'period of restoration,'" when the "'suspension' [is] caused by direct 'loss' to property at [the]

---

[5] These facts are based on the allegations within the CAC, which, as set forth below, the Court must generally accept as true for purposes of ruling on the pending Motion to Dismiss. *Blanyar v. Genova Products, Inc.*, 861 F.3d 426, 431 (3d Cir. 2017).

[6] As the source of the Policies' language, the Court cites to the insurance policy issued by Cincinnati to Plaintiff Betty Jo Hirschfield-Louik, DMD, traded as Uptown Dental (ECF No. 89-1). While Plaintiffs also filed copies of the insurance policies issued by Cincinnati to the other Plaintiffs in this case (ECF Nos. 89-2 through 89-8), Plaintiffs assert that the terms of the Policies of all Plaintiffs "provide[d] substantially identical business income loss coverages" (ECF No. 88 ¶ 23). Thus, throughout this Opinion, the Court uses Plaintiff Hirschfield-Louik's policy as the example of what the Policies provided.

'premises' caused by or resulting from any Covered Cause of Loss." (*Id.* at 46.) In addition, as an "extension" of "business income" coverage, the Policies provide that Cincinnati "will pay for the actual loss of 'Business Income' [] sustain[ed] due to the necessary 'suspension' of [the policyholder's] 'operations' during the 'period of restoration'" when the 'suspension' [is] caused by direct 'loss' to '*dependent property*' caused by or resulting from any Covered Cause of Loss." (*Id.* at 85–86.) As used in this "dependent property" coverage provision, "dependent property" means "property operated by others whom [the policyholder] depend[s] on" to perform certain enumerated functions. (*Id.* at 86.)

Second, under the "extra expense" provision, Cincinnati "will pay Extra Expense [] sustain[ed] during the 'period of restoration'" referred to in the "business income" provision, *i.e.*, "necessary expenses [] sustain[ed] . . . during the 'period of restoration' that [the policyholder] would not have sustained if there had been no direct 'loss' to property caused by or resulting from a Covered Cause of Loss." (*Id.* at 47.)

In both the "business income" and "extra expense" provisions, "'period of restoration' means the period of time that: a. [b]egins at the time of direct 'loss' [and] b. [e]nds on the earlier of: (1) [t]he date when the property at the 'premises' should be repaired, rebuilt, or replaced with reasonable speed or similar quality; or (2) [t]he date when business is resumed at a new permanent location." (*Id.* at 65–66.)

The third relevant type of coverage is "civil authority" coverage. (*Id.* at 5.) Under civil authority coverage, "[w]hen a Covered Cause of Loss causes damage to property *other than* Covered Property at [the] 'premises,' [Cincinnati] will pay for the actual loss of 'Business Income' and necessary Extra Expense [] sustain[ed] caused by action of civil authority that prohibits access to the 'premises,' provided that . . . (a) [a]ccess to the area immediately surrounding the damaged

property is prohibited by civil authority as a result of the damage; and (b) [t]he action of civil authority is taken in response to dangerous physical conditions resulting from the damage or continuation of the Covered Cause of Loss that caused the damage, or . . . to enable a civil authority to have unimpeded access to the damaged property." (*Id.* at 46 (emphasis added).)

The Policies also contain "exclusions," which are events against which the Policies do not protect. (*Id.* at 32.) However, while some commercial property insurance policies contain a "virus exclusion," the Policies at issue here do not. (ECF No. 88 ¶ 39.)

### b. <u>COVID-19 and the "Mandated Shutdown Rules"</u>

COVID-19 refers to the novel strain of coronavirus that was first discovered in China in late 2019 and the global pandemic that resulted from the outbreak of the virus. (*See* ECF No. 88 ¶ 70; *Basics of COVID-19*, Ctrs. for Disease Control & Prevention (Nov. 4, 2021), https://www.cdc.gov/coronavirus/2019-ncov/your-health/about-covid-19/basics-covid-19.html.) The virus "is highly contagious and can be spread exponentially in the community by persons who are symptomatic, asymptomatic or pre-symptomatic." (ECF No. 88 ¶ 71.)

COVID-19 is "[t]ransmitted through airborne respiratory droplets . . . [that] accumulate[] in the air and can physically attach to and stay on surfaces of objects or materials for many days" by "create[ing] a chemical bond affixing [the virus] to surfaces." (*Id.* ¶ 72.) According to a study by *The New England Journal of Medicine*, "COVID-19 remains stable and transmittible in aerosols for up to three hours, up to four hours on copper, up to 24 hours on cardboard and up to two to three days on plastic and stainless steel." (*Id.* ¶ 76 (citing *New Coronavirus Stable for Hours on Surfaces*, Nat'l Insts. of Health (Mar. 17, 2020), https://www.nih.gov/news-events/news-releases/new-coronavirus-stable-hours-surfaces).) Another study published in the *Journal of Hospital Infection* found that "coronaviruses can remain infectious on inanimate surfaces at room

temperature for up to 9 days." (*Id.* ¶ 77 (quoting Sofia Quaglia, *Coronavirus: 4 Studies Explain What You Need to Know About COVID-19 Sticking to Surfaces*, Inverse (Mar. 21, 2020), https://www.inverse.com/science/coronavirus-4-studies-explain-how-covid-19-sticks-to-surfaces).) "[S]ome cleaning products will both inactivate and remove COVID-19 from surfaces;" however, eradicating COVID-19 from a property is "nearly impossible" given its invisibility to the human eye and ability to easily spread. (*Id.* ¶ 75.)

In response to the COVID-19 pandemic, "[o]n March 19, 2020, the Governor of Pennsylvania issued an Executive Order closing all non-essential businesses" (ECF No. 88 ¶ 79.) As relevant to Plaintiffs, the Executive Order prohibited dine-in service at restaurants and bars, closed sporting event venues, closed salons, and prohibited dental practices from operating except for certain emergent procedures. (*Id.* ¶ 80.)

Other components of government in Pennsylvania also issued related rules and guidance related to how certain businesses must operate during the pandemic, including the Department of Health's March 22, 2020 direction that "all dental facilities immediately cease all treatment until further notice except for urgent and emergency procedures." (*Id.* ¶ 83.) Plaintiffs refer to the various government orders, guidance, and protocols relating to Plaintiffs' businesses as the "Mandated Shutdown Rules." (*Id.* ¶ 104.)[7]

Although "[a]t the time of the Mandated Shutdown Rules, there was no specific way to test for COVID-19 on surfaces, and human testing for COVID-19 was significantly delayed and difficult to obtain[,] . . . Plaintiffs believe and aver that COVID-19 was present on the premises of their Covered Properties by the time the Mandated Shutdown Rules were announced." (*Id.* ¶¶ 191–

---

[7] Throughout this Opinion, the Court uses "Mandated Shutdown Rules" in discussing both the government orders at issue in this case and the government orders at issue in other cases limiting the operations of the plaintiffs' businesses in those cases.

92.)

The Mandated Shutdown Rules were modified throughout 2020 to allow phased reopening and increased operations of non-essential businesses. For example, on May 8, 2020, the Commonwealth began the process of transitioning certain counties—including Allegheny County, where some of Plaintiffs' businesses are located—to a "yellow" phase such that "low-risk businesses" could reopen. (*Id.* ¶ 88.) On the same date, the Department of Health modified its March 2020 guidance to "to remove the absolute prohibition against elective or non-urgent dental procedures," but the Department discouraged dental procedures that involved an increased risk of COVID-19 transmission between people or procedures performed when personal protective equipment was not available. (*Id.* ¶ 87.)

The Commonwealth continued allowing phased expansion of business operations as COVID-19 conditions improved—for example, restaurants and bars located in counties in the "green" phase "were able to open their indoor seating areas, but had to adhere to seating limitations and social distancing[,] and event venues were to have a maximum of 250 people." (*Id.* ¶¶ 90–92.) However, when COVID-19 cases began to rise again, the Governor curtailed the operations of businesses like restaurants and event venues in response. (*Id.* ¶¶ 93–95.)

"Most other states, including those in which the putative Class members reside and/or do business, have issued similar compulsory shut-down orders for 'non-essential' businesses, or businesses deemed not to be 'life sustaining,'" as the Mandated Shutdown Rules issued in Pennsylvania. (*Id.* ¶ 89.) Such orders in other states, like Pennsylvania, included "directives from public health officials curtailing non-urgent or non-emergent health care services." (*Id.*)

### c. **Plaintiffs' Insurance Claims**

As a result of the Mandated Shutdown Rules in Pennsylvania, "all of [] Plaintiffs'

businesses operated at their Covered Properties closed." (*Id.* ¶ 104.) Thus, Plaintiffs "were unable to fully operate as sporting events centers, restaurants, bars, salons, or dentistry practices." (*Id.* ¶ 105.)

"Shortly after closing their business Plaintiffs provided notice to [Cincinnati] of their claims for the interruption to their businesses." (*Id.* ¶ 107.) Cincinnati denied Plaintiffs' claims through "form denial letters provided to each Plaintiff in response to their claims," which stated that "Cincinnati ha[d] determined that coverage is unavailable for the claimed loss. (*Id.* ¶ 108.)

After Cincinnati denied Plaintiffs' claims, Plaintiffs filed the actions that have been consolidated in this case, bringing claims on behalf of Plaintiffs individually and members of the classes they seek to represent. Plaintiffs allege that Cincinnati wrongfully denied them coverage under the business income, extra expense, civil authority, and dependent property coverage provisions within their Policies. (*See id.* ¶¶ 34–37, 114–16.)

## IV.   GOVERNING LEGAL PRINCIPLES

### a.   Legal Standard for Motions to Dismiss Pursuant to Rule 12(b)(6)

Under Federal Rule of Civil Procedure 12(b)(6), a court may dismiss a complaint for "failure to state a claim upon which relief can be granted." "Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements," are not enough to survive a Rule 12(b)(6) motion. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007)). Rather, a plaintiff's factual allegations must "raise a right to relief above the speculative level" and state a plausible claim for relief. *Twombly*, 550 U.S. at 555.

In reading the complaint, the court should "accept all factual allegations as true, construe the complaint in the light most favorable to the plaintiff, and determine whether, under a reasonable reading of the complaint, the plaintiff may be entitled to relief." *Blanyar v. Genova Prods. Inc.*,

861 F.3d 426, 431 (3d Cir. 2017) (quoting *Fowler v. UPMC Shadyside*, 578 F.3d 203, 210 (3d Cir. 2009)). "[C]ourts have an obligation in matters before them to view the complaint as a whole and to base rulings not upon the presence of mere words but, rather, upon the presence of a *factual situation* which is or is not justiciable." *Doug Grant, Inc. v. Greate Bay Casino Corp.*, 232 F.3d 173, 184 (3d Cir. 2000) (quoting *City of Pittsburgh v. W. Penn Power Co.*, 147 F.3d 256, 263 (3d Cir. 1998)) (alteration in original) (emphasis added).

The Third Circuit further guides lower courts to utilize a three-part framework in analyzing a 12(b)(6) motion. First, the court "identif[ies] the elements of the claim." *Malleus v. George*, 641 F.3d 560, 563 (3d Cir. 2011). Second, the court "review[s] the complaint to strike conclusory allegations." *Id*. Third, the court "look[s] at the well-pleaded components of the complaint and evaluat[es] whether all of the elements identified in part one of the inquiry are sufficiently alleged." *Id*. If the facts alleged in the complaint "show" that the plaintiff is entitled to relief, the court should deny the motion to dismiss. *See Fowler*, 578 F.3d at 210–11.

In ruling on a motion to dismiss, the only documents a court may consider are "the complaint, attached exhibits, matters of public record, and undisputedly authentic documents not attached to the complaint if the complainant's claims are based on those documents." *Panthera Rail Car LLC v. Kasgro Rail Corp.*, 985 F. Supp. 2d 677, 683 (W.D. Pa. 2013) (citing *Mayer v. Belichick,* 605 F.3d 223, 230 (3d Cir. 2010)). Finally, a court evaluating a motion to dismiss must "draw on its judicial experience and common sense." *United States ex rel. Bookwalter v. UPMC*, 946 F.3d 162, 177 (3d Cir. 2019) (citing *Iqbal*, 556 U.S. at 679).

### b. <u>Applicable Substantive Law</u>

The parties rely on Pennsylvania law in their briefing on the Motion to Dismiss. (*See* ECF No. 99, at 12 (citing *Guar. Tr. Co. v. York*, 326 U.S. 99, 108 (1945)) ("In a diversity action,

Pennsylvania insurance policy-construction law controls, and the Court acts as "only another court of" Pennsylvania."). *See generally* ECF Nos. 96, 99, 103.) The Court agrees that Pennsylvania insurance contract interpretation law applies to this case.

"Under the familiar doctrine of *Erie Railroad v. Tompkins*, federal courts sitting in diversity jurisdiction apply state law to substantive issues and federal law to procedural issues." *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 181 (3d Cir. 2017). "Issues of contract interpretation are considered 'quintessentially substantive,' rather than procedural, under *Erie*," *Collins*, 874 F.3d at 182, as are choice-of-law rules, *Frankentek Residential Sys., LLC v. Buerger*, 15 F. Supp. 3d 574, 580 (E.D. Pa. 2014). In this case, choice-of-law analysis is unnecessary because insurance contract interpretation law in Pennsylvania (Plaintiffs' place of citizenship) and Ohio (Cincinnati's place of citizenship) is substantially similar in all relevant respects.[8] *See* Erie Opinion, at 14–17. Thus, the Court applies the insurance contract interpretation law of Pennsylvania, the state in which the actions making up this case were filed.

"Insurance policies are contracts," so the common law rules of contract interpretation apply to the parties' disputes about Cincinnati's commercial property insurance Policies involved in this case. *Post v. St. Paul Travelers Ins. Co.*, 691 F.3d 500, 517 (3d Cir. 2012). The Eastern District of Pennsylvania succinctly summarized Pennsylvania insurance contract interpretation law in *Moody v. Hartford Financial Group, Inc.*:

> Under Pennsylvania law, . . . "[c]ontract interpretation is a question of law that requires the court to ascertain and give effect to the intent of the contracting parties as embodied in the written agreement." *In re Old Summit Mfg.*, LLC, 523 F.3d 134,

---

[8] Unlike Pennsylvania, Ohio does not recognize the reasonable expectations doctrine, under which—as explained below—a policyholder may be entitled to insurance coverage, even if the terms of the policy clearly and unambiguously preclude coverage, because the policyholder reasonably expected coverage and the insurer engaged in some sort of misconduct. *See Andersen v. Highland House Co.*, 757 N.E.2d 329, 338 (Ohio 2001) (Cook, J., dissenting). Because the parties agree that Pennsylvania law governs here, and because Plaintiffs are not entitled to coverage under Pennsylvania's reasonable expectations doctrine as this Opinion explains, the Court concludes that this difference between Pennsylvania and Ohio insurance contract interpretation law does not require a choice-of-law analysis.

137 (3d Cir. 2008) (quoting *Dep't of Transp. v. Pa. Indus. for the Blind & Handicapped*, 886 A.2d 706, 711 (Pa. Cmwlth. Ct. 2005)).

The Court's analysis begins with whether a provision in the insurance policy is ambiguous.[9] When insurance policy language is "clear and unambiguous," a court applying Pennsylvania law must "give effect to that language." *401 Fourth Street v. Inv'rs Ins. Group*, 879 A.2d 166, 170 (2005). "Alternatively, when a provision in the policy is ambiguous, the policy is to be construed in favor of the insured to further the contract's prime purpose of indemnification and against the insurer, as the insurer drafts the policy, and controls coverage." *Kvaerner Metals Div. of Kvaerner U.S., Inc. v. Commercial Union Ins. Co.*, 908 A.2d 888, 897 (2006) (quoting *401 Fourth St.*, 879 A.2d at 170) (internal quotation marks omitted). A policy is ambiguous "if it is reasonably susceptible of different constructions and capable of being understood in more than one sense." *Madison Const. Co. v. Harleysville Mut. Ins. Co.*, 735 A.2d 100, 106 (1999) (quoting *Hutchison v. Sunbeam Coal Corp.*, 519 A.2d 385, 390 (1986)).

Under Pennsylvania law, "ambiguity (or the lack thereof) is to be determined by reference to a particular set of facts." *Id.* at [107]. The "proper focus regarding issues of coverage under insurance contracts is the reasonable expectation of the insured." *Bubis v. Prudential Prop. & Cas. Ins. Co.*, 718 A.2d 1270, 1272 (Pa. Super. Ct. 1998). Under Pennsylvania law, even if the terms of the insurance contract are clear and unambiguous, the insured's reasonable expectations may prevail over the express terms of the contract in certain circumstances. *See Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38 F.3d 1303, 1309 (3d Cir. 1994). Nonetheless, the language of the insurance contract itself serves as the best evidence of the parties' reasonable expectations. See *Safe Auto Ins. Co. v. Berlin*, 991 A.2d 327, 332 (Pa. Super. Ct. 2010).

The insured party bears the burden to "make a prima facie showing that a claim falls within the policy's grant of coverage." *State Farm Fire & Cas. Co. v. Estate of Mehlman*, 589 F.3d 105, 111 (3d Cir. 2009) (applying Pennsylvania law). Once that burden is met, the insurance company "bears the burden of proving the applicability of any exclusions or limitations on coverage." *Koppers Co. v. Aetna Cas. & Sur. Co.*, 98 F.3d 1440, 1446 (3d Cir. 1996) (applying Pennsylvania law).

513 F. Supp. 3d 496, 502–03 (E.D. Pa. 2021) (footnotes omitted).

With the emergence of COVID-19 and the resulting lawsuits similar to the actions in this

---

[9] While not explicitly stated in *Moody*, courts apply ordinary rules of interpreting language in a contract, statute, or other legal document when determining whether language in an insurance contract is ambiguous. *See, e.g., Ceres Enterprises, LLC v. Travelers Ins. Co.*, 520 F. Supp. 3d 949, 955–56 (N.D. Ohio 2021) (explaining that courts must consider the "plain language of the contract" as well as "the insurance policy as a whole" to "giv[e] meaning to each term and constru[e] the provisions within the context of the entire policy).

case, in which policyholders have sought coverage under their property insurance contracts for interruptions to their business operations related to COVID-19, courts have been required to apply the general principles of insurance contract interpretation summarized above to a somewhat novel factual context. Thousands of such cases in state and federal courts throughout the country have been decided. However, none have yet been decided by the Pennsylvania Supreme Court, leaving uncertainty as to how that court would decide the issues of Pennsylvania common law that this case implicates.

When a federal district court applies a particular state's substantive law, "[i]n the absence of a definitive ruling by [the] state's highest court, [the district court] must predict how that court would rule if faced with the issue." *Lupu v. Loan City, LLC*, 903 F.3d 382, 389 (3d Cir. 2018). "In so doing, [the district court] must look to decisions of [the] state['s] intermediate appellate courts," *id.*; where a decision by the state's intermediate appellate court "rests its considered judgment upon the rule of law which it announces, that is a datum for ascertaining state law which is not to be disregarded by a federal court unless it is convinced by other persuasive data that the highest court of the [jurisdiction] would decide otherwise," *West v. Am. Tel. & Tel. Co.*, 311 U.S. 223, 237 (1940).

In addition, a district court predicting how a state's highest court would decide an issue "must look to decisions of . . . federal courts interpreting that [state's] law." *Lupu*, 903 F.3d at 389. Decisions by federal Courts of Appeals are particularly instructive—many Courts of Appeals have held that when a circuit Court of Appeals makes a determination concerning the laws of a state within that circuit, "the federal courts of other circuits should defer to that holding, perhaps always, and at least in all situations except the rare instance when it can be said with conviction that the pertinent court of appeals has disregarded clear signals emanating from the state's highest court

14

pointing toward a different rule." *Factors Etc., Inc. v. Pro Arts, Inc.*, 652 F.2d 278, 282–83 (2d Cir. 1981); *see also Mellon Bank, N.A. v. Ternisky*, 999 F.2d 791, 796 (4th Cir. 1993); *Ehrenfelt v. Janssen Pharm., Inc.*, 737 F. App'x 262, 265 (6th Cir. 2018); *Dawn Equip. Co. v. Micro-Trak Sys., Inc.*, 186 F.3d 981, 989, n.3 (7th Cir. 1999); *Abex Corp. v. Maryland Cas. Co.*, 790 F.2d 119, 125-26 (D.C. Cir. 1986); *Jones Truck Lines v. Transp. Ins. Co.*, No. 88-5723, 1989 WL 49517, at *5 (E.D. Pa. May 10, 1989) (concluding this reasoning was persuasive based on only the Second and District of Columbia Circuits' articulation of the rule).

Finally, other sources that a district court predicting the outcome of an issue of state law must consider include "decisions of . . . other state [highest] courts that have addressed the issue, as well as [] analogous decisions, considered dicta, scholarly works, and any other reliable data tending convincingly to show how the highest court in the state would decide the issue at hand." *Id.* As the Court explained in *In re: Erie*, in several jurisdictions—specifically, those whose law applied to the actions in the MDL—the law of insurance contract interpretation is substantially similar. Erie Opinion, at 14–17. Thus, COVID-19 business interruption insurance decisions of state and federal courts applying the law of jurisdictions other than Pennsylvania may also be indicators of the proper outcome of such a case under Pennsylvania law.

## V.   ANALYSIS

### a.   Types of Coverage Claimed and the Threshold Requirement of "Direct Physical Loss of or Damage to" Property

Plaintiffs claim that they are entitled to "business income" and "extra expense" coverage based on what they allege is "direct physical loss or damage" to their properties as a result of the COVID-19 pandemic and the Mandated Shutdown Rules, and that they are entitled to "civil authority" and "dependent property" coverage based on "direct physical loss or damage" to *other* properties and the inability for Plaintiffs to access their property due to governmental orders related

15

to that damage or to perform certain business functions based on damage to other properties. (*See* ECF No. 88, ¶¶ 109–16.) A threshold requirement for any of the provisions under which Plaintiffs claim coverage is that "direct loss"—which translates to "direct 'accidental physical loss or accidental physical damage'" based on the Policies' definition of "loss"—to property, whether Plaintiffs' properties or other property, occurred as a result of a "covered cause of loss." (*See* ECF No. 89-1, at 30, 32, 46–47, 65–66, 85–86.)

Plaintiffs assert two "covered cause[s] of loss" that they allege caused "direct physical loss or damage" to property: (1) COVID-19 itself and (2) the Mandated Shutdown Rules issued to mitigate the virus's spread. (ECF No. 88 ¶¶ 109–10.) Under the Policies, a "covered cause of loss" is "direct 'loss' unless the 'loss' is excluded or limited" by the Policies, *i.e.*, "direct 'accidental *physical* loss or accidental *physical* damage'" unless excluded or limited by the Policies. (ECF No. 89-1, at 32, 65 (emphasis added).) Thus, a "covered cause of loss" must itself be of a physical nature,[10] and the impact that it has on property must meet the definition of "direct physical loss" or "direct physical damage" to covered property.

The parties' primary dispute as to whether either asserted "covered cause of loss" leads to coverage under the Policies is whether those events caused "direct physical loss or damage" to covered property,[11] which as stated and as the parties agree is a prerequisite for the types of coverage that Plaintiffs claim they were entitled to under their Policies. Thus, the Court must

---

[10] While Plaintiffs seemed to dispute this point in their CAC and in their Brief in Opposition to the Motion to Dismiss (*see* ECF No. 99, at 24 (arguing that "[b]ecause the Mandated Shutdown Rules *physically* limited the use of Plaintiffs' Covered Properties for their primary purposes, Plaintiffs suffered 'accidental physical loss' under the Policies," thereby accounting for the word "physical" by arguing that physical loss occurs when a property owner has lost the use of its physical premises)), Plaintiffs conceded during oral argument that the covered cause of loss must be physical in nature (*see* ECF No. 270, at 90:13–91:6 (stating that the covered cause of loss must be "physical in nature" and "[h]a[ve] [] to do with a physical substance"), 157:1–:6 (stating that if it were for the Mandated Shutdown Rules alone and not the COVID-19 pandemic, Plaintiffs may have "an impossible case")).

[11] The parties do not dispute that the loss or damage that Plaintiffs allege that their properties incurred was "accidental."

interpret the meaning of "direct physical loss or damage"—which the Court applies as "direct physical loss of or damage to" property for consistency with its other decisions involving nearly identical policy language[12]—to decide whether Plaintiffs have plausibly demonstrated that such occurred as a result of COVID-19 itself or the Mandated Shutdown Rules.

### b. **The Parties' Arguments**

Plaintiffs' and Cincinnati's arguments as to whether Plaintiffs were entitled to coverage under the Cincinnati Policies, based on the meaning of "direct physical loss of or damage to" property, largely mirror those advanced by the plaintiffs and defendants in *In re: Erie*. *See* Erie Opinion, at 20–24 (explaining those arguments). Further, as noted above, during oral argument as to Cincinnati's Motion to Dismiss, Plaintiffs in this case and the plaintiffs in *In re: Erie* and two other COVID-19 business interruption insurance cases before this Court argued their position as to the dispositive motions in those cases as a group, as did Defendants. Thus, below, the Court briefly summarizes the coverage-related arguments advanced by Plaintiffs and Cincinnati in this case.

In its Motion to Dismiss, Cincinnati argues that based on the language used in the phrase "direct physical loss of or damage to" property and surrounding language within the Policies, such as the "period of restoration" clauses, "direct physical loss of or damage to" property unambiguously requires an "actual, tangible[] alteration" to property. (ECF No. 96, at 14–17.) According to Cincinnati, Plaintiffs have at most plausibly shown that they suffered economic harm as a result of the Mandated Shutdown Rules that were issued to prevent the spread of the

---

[12] Referring to the Policies' "direct loss" requirement (ECF No. 89-1, at 30) as "direct physical loss of or damage to" property is proper because the Policies define "loss" as "accidental physical loss or accidental physical damage" (*id.* at 65), and thus, "direct loss" translates to "direct 'accidental physical loss or accidental physical damage.'" Because the parties do not dispute that the alleged loss or damage was "accidental," the only descriptors of loss and damage at issue are "direct" and "physical."

"ubiquitous" COVID-19 virus. (*Id.* at 17.) Cincinnati argues that the Mandated Shutdown Rules did not tangibly alter Plaintiffs' property and that Plaintiffs have not plausibly pleaded that the COVID-19 virus was present at their properties such that it could have tangibly altered the property, if such tangible alteration of property by a virus is even possible. (*Id.*)

In response, Plaintiffs argue that "direct physical loss of or damage to" property has an alternative reasonable meaning and thus that this Court must construe the phrase in favor of Plaintiffs as the policyholders. Plaintiffs identify and apply dictionary definitions of the terms "physical" and "loss" to argue that "direct physical loss of or damage to" property includes "*losing the ability to materially use* brick-and-mortar property for its intended purpose." (ECF No. 99, at 15–18.) Plaintiffs argue that cases applying Pennsylvania insurance contract interpretation law to COVID-19-related and non-COVID-19-related claims support their interpretation of "direct physical loss of or damage to" property. (*Id.* at 18–23.) Thus, Plaintiffs argue that (1) the Mandated Shutdown Rules, by limiting how Plaintiffs could "materially use" their physical spaces, caused "direct physical loss of or damage to" their properties, and (2) the "ubiquitous nature and *suspected* presence of the COVID-19 virus on Plaintiffs' properties" constituted a physical substance that contaminated Plaintiffs' properties and made them "unsafe and unusable," thereby also, like the Mandated Shutdown Rules, causing "direct physical loss of or damage to" their properties. (*Id.* at 23–24 (emphasis added).)

### c.  <u>Meaning of "Direct Physical Loss of or Damage to" Property</u>

As noted above, the Pennsylvania Supreme Court has not yet decided a COVID-19 business interruption insurance case—in which a key issue is the meaning of the requirement in commercial property insurance policies of "direct physical loss of or damage to" property—so the Court must predict how the Pennsylvania Supreme Court would decide such a case. While

decisions from Pennsylvania's intermediate appellate court, the Pennsylvania Superior Court, would be instructive to the Court in this task, the Superior Court also has not yet decided a COVID-19 business interruption insurance case.

Thus, to determine the meaning of "direct physical loss of or damage to" property and whether such loss or damage results from COVID-19 or related Mandated Shutdown Rules, the Court must consider decisions by other courts that have decided either COVID-19 business interruption insurance cases or other cases that are instructive on the issue of whether COVID-19 or the Mandated Shutdown Rules are covered causes of loss under Cincinnati's Policies.

In *In re: Erie*, this Court examined in detail the leading decisions in COVID-19 business interruption insurance cases or other insurance cases by courts applying Pennsylvania law as well as such decisions by courts applying the law of other jurisdictions that applied to actions in the MDL. The Court noted that the Third Circuit, within which Pennsylvania is located, also has not yet decided a COVID-19 business interruption insurance case,[13] but it has issued precedential and non-precedential decisions in cases involving an insurance claim for expenses incurred from the abatement of asbestos-containing materials, *see Port Auth. of NY & NJ v. Affiliated FM Ins. Co.*, 311 F.3d 226 (3d Cir. 2002), and an insurance claim stemming from vacating of a home in which the water supply was contaminated with *E. coli* bacteria, *see Motorists Mut. Ins. Co. v. Hardinger*, 131 F. App'x 823, 826 (3d Cir. 2005).[14]

---

[13] The Third Circuit heard argument in fourteen consolidated COVID-19 business interruption insurance cases on September 28, 2022, *Rhonda Wilson v. USI Insurance Services LLC*, No. 20-3124, ECF No. 142, at 2 (Sept. 8, 2022), and that court has stayed the resolution of other similar appeals that have not been consolidated with those set to be argued pending the resolution of the consolidated cases before it or until further order of that court, *Wilson*, No. 20-3124, ECF No. 43, at 2 (April 6, 2021).

[14] While *Port Authority* involved New York and New Jersey law, and not Pennsylvania law, the panel of the Third Circuit in *Hardinger*, which involved Pennsylvania law, relied on *Port Authority* because the panel stated, "[w]e find nothing . . . in New York, New Jersey, or Pennsylvania law that would cause us to disregard *Port Authority* under Pennsylvania law." *Hardinger*, 131 F. App'x at 826.

In *Port Authority*, the Third Circuit concluded that "direct physical loss of or damage to" property usually requires "a distinct, demonstrable, and physical alteration" of the property, and when the cause of the asserted loss or damage is "unnoticeable to the naked eye," it only constitutes direct physical loss or damage if the "function [of the property] is nearly eliminated or destroyed, or the structure is made useless or uninhabitable." 311 F.3d at 235–36. Based on that principle, the Third Circuit agreed with the district court that "'physical loss or damage' occurs only if an actual release of asbestos fibers from asbestos containing materials has resulted in contamination of the property such that its function is nearly eliminated or destroyed, or the structure is made useless or uninhabitable, or if there exists an imminent threat of the release of a quantity of asbestos fibers that would cause such loss of utility," and that "[t]he mere presence of asbestos, or the general threat of future damage from that presence, lacks the distinct and demonstrable character necessary for first-party insurance coverage." *Id.* at 236.

The Third Circuit concluded that this outcome was consistent with the purpose of "all risk" property insurance policies and did not stretch the policies beyond that purpose. *See id.* at 234–36 ("It is worthy of note . . . that in the insurance industry, 'all risks' does not mean 'every risk.' . . . The requirement that [] contamination [by a source invisible to the naked eye] reach such a level in order to come within coverage [] establishes a reasonable and realistic standard for identifying physical loss or damage. . . . A less demanding standard . . . would not comport with the intent of a first-party 'all risks' insurance policy, but would transform it into a maintenance contract.").

The panel in *Hardinger* concluded that, based on *Port Authority*, there was a genuine issue of fact in *Hardinger* of whether *E. coli* in the water supply for a home caused physical loss of the property. 131 F. App'x at 826–27. "While . . . asbestos presents unique concerns," the court nonetheless found *Port Authority*'s treatment of asbestos-related claims instructive: asbestos, like

*E. coli*, is a physical substance unnoticeable to the naked eye, and *Port Authority* had explained that in cases in which "direct physical loss of or damage to" is alleged to have been caused by such a source, such loss or damage can be shown if "use of the property [is reduced] to a substantial degree," *i.e.*, if "the functionality of the [property] [is] nearly eliminated or destroyed." *Id*. On the record before the panel in *Hardinger*, it was disputed whether the impact to the homeowner's property rose to that level—*i.e.*, rendered the property completely useless and uninhabitable—and the panel reversed the district court's grant of summary judgment in favor of the insurer in part on that basis. *See id.*[15]

Several federal district courts within the Third Circuit that have decided COVID-19 business interruption insurance cases have dismissed claims like Plaintiffs' claims here, concluding based on *Port Authority* and *Hardinger* that neither the COVID-19 virus nor the Mandated Shutdown Rules cause "direct physical loss of or damage to" property. *See, e.g.*, *Moody*, 513 F. Supp. 3d at 506–07 ("Neither the presence of the virus nor an imminent threat thereof . . . has 'nearly eliminated or destroyed' the property's functionality or rendered it 'useless or uninhabitable.' *Hardinger*, 131 F. App'x at 826-27. . . . Because surfaces would merely need to be

---

[15] *Cooper v. Travelers Indemnity Co.*, No. 01-2400, 2002 WL 32775680 (N.D. Cal. Nov. 4, 2002), is another pre-COVID-19 pandemic case that considered a claim for insurance coverage based on the presence of *E. coli* in the property's water supply. While the law of California is not involved in any action in this case, the Court finds this case instructive as to whether, and if so, how, COVID-19 differs from *E. coli* in terms of impact on property, and the Court describes the case here to aid in its analysis below.

In *Cooper*, the plaintiff owned property on which the plaintiff operated a restaurant, and the plaintiff had a commercial property insurance policy with the defendant to insure the restaurant against "direct physical loss of or damage to Covered Property at the premises . . . caused by or resulting from a Covered Cause of Loss." *Id*. at *1–2. "The source of water for the buildings on the property was a well located on the property"; "[o]n February 13, 1999, water from the well tested positive for the presence of [*E. coli*]," and "[c]ounty health authorities ordered the closure of the tavern due to the [*E. coli*] contamination of the well." *Id*. at *1. The plaintiff "made repeated, but ultimately unsuccessful, efforts to disinfect the well," and the defendant hired "a firm of water and sewer experts" to determine the possible causes of the contamination. *Id*. at *1–2. The plaintiff ultimately "had a new well installed on the property in a location unaffected by the contamination," after which he reopened the restaurant that he operated on the property. *Id*. at *2. The plaintiff sued its insurer when his claims were denied, and the court ruled for the plaintiff, concluding that "the closure of the tavern . . . was a necessary suspension of [the plaintiff's] operation of the tavern that resulted from direct physical damage to the property at the insured premises." *Id*. at *5.

cleaned, contamination would not meet the requirements under *Port Authority* because presence of the virus would not render the property useless or uninhabitable or nearly eliminate or destroy its functionality."); *4431, Inc. v. Cincinnati Ins. Cos.*, 504 F. Supp. 3d 368, 385 (E.D. Pa. 2020) ("[*Port Authority* and *Hardinger*] support the conclusion that under Pennsylvania law, for Plaintiffs to assert an economic loss resulting from their inability to operate their premises as intended within the coverage of the Policy's "physical loss" provision, . . . [Plaintiffs must show] an element correlating to extent of operational utility—i.e., a premises must be uninhabitable and unusable, or nearly as such; the ability to operate in almost any capacity, even on a limited basis, precludes coverage."); *Kahn v. Pennsylvania Nat'l Mut. Cas. Ins. Co.*, 517 F. Supp. 3d 315, 324 (M.D. Pa. 2021) ("Plaintiffs here do not allege that the physical structure that houses their restaurant was physically unusable—just that the intended purpose of the business (serving food to patrons indoors) could not be executed due to the state's guidance to avoid public gatherings. But the Third Circuit in *Port Authority* clearly distinguished between a *building* (not a business) that was physically unusable and one that was contaminated but still physically safe to inhabit. There are no facts alleged here to support a conclusion that the building in which Mauldin's was located was rendered physically unusable.").

The outcome of those cases within the Third Circuit is consistent with the majority of decisions in COVID-19 business interruption insurance cases throughout the country, which, although not always applying Pennsylvania law, have concluded under the substantially similar law of other jurisdictions that neither the COVID-19 virus nor the Mandated Shutdown Rules are a covered cause of loss under policies like Cincinnati's Policies. Notably, every federal Court of Appeals that has decided a COVID-19 business interruption insurance case has concluded that policyholders cannot recover business losses stemming from the virus or the Mandated Shutdown

Rules under Cincinnati's Policies or similar policies. *See* Erie Opinion, at 24–42 (detailing the reasoning and conclusions by the Second, Fourth, Sixth, and Seventh Circuits—in decisions applying New York, Maryland, Ohio, and Illinois law, respectively—that (1) "'direct physical loss of or damage to' property occurs [either] when a structural alteration to property is evident and requires that the affected property be repaired, rebuilt, or replaced before the property can be used again[,] . . . [and/or] when property does not experience structural damage but is impacted by a physical substance to such a degree that the property is uninhabitable and unusable until the impact is affirmatively ameliorated," and (2) neither the COVID-19 virus nor the Mandated Shutdown Rules constitute such loss or damage); *see also Legal Sea Foods, Inc. v. Strathmore Ins. Co.*, 36 F.4th 29 (1st Cir. 2022); *Terry Black's Barbecue, LLC v. State Auto. Mut. Ins. Co.*, 22 F.4th 450 (5th Cir. 2022); *Oral Surgeons, P.C. v. Cincinnati Ins. Co.*, 2 F.4th 1141 (8th Cir. 2021); *Mudpie, Inc. v. Travelers Cas. Ins. Co.*, 15 F.4th 885 (9th Cir. 2021); *Goodwill Indus. of Cent. Oklahoma, Inc. v. Philadelphia Indem. Ins. Co.*, 21 F.4th 704 (10th Cir. 2021), *cert. denied*, 142 S. Ct. 2779 (2022); *Gilreath Fam. & Cosm. Dentistry, Inc. v. Cincinnati Ins. Co.*, No. 21-11046, 2021 WL 3870697 (11th Cir. Aug. 31, 2021).

In many of the federal Court of Appeals cases cited here, the involved Court of Appeals based its decision on pre-COVID-19 pandemic decisions by intermediate or the highest appellate courts within the jurisdiction whose law applied to the case. For example, in *Sandy Point Dental, P.C. v. Cincinnati Insurance Co.*, the Seventh Circuit examined two cases by the Illinois Supreme Court, in which that court had concluded that "the term 'physical injury' unambiguously connotes . . . an alteration in appearance, shape, color or in other material dimension," *Traveler's Ins. Co. v. Eljer Mfg. Inc*, 757 N.E.2d 481, 502 (Ill. 2001)), and that substance that does not physically alter property but that contaminates it "to the point where corrective action, under the law, must be

taken" can cause "direct physical loss of or damage to" property, *U.S. Fidelity & Guaranty Co. v. Wilkin Insulation Co.*, 578 N.E.2d 926, 931–32 (Ill. 1991). *Sandy Point*, 20 F.4th 327, 331–34 (7th Cir. 2021). Likewise, in *10012 Holdings, Inc. v. Sentinel Insurance Co.*, the Second Circuit followed the holding of *Roundabout Theatre Co. v. Continental Casualty Co.*, in which the New York Appellate Division concluded "direct physical loss of or damage to" property does not include "mere loss of use of a premises, where there has been no physical damage to premises." *10012 Holdings*, 21 F.4th 216, 220–22 (2d Cir. 2021) (citing *Roundabout Theatre*, 751 N.Y.S.2d 4, 5, 8 (N.Y. App. Div. 2002)).[16] *See also* Erie Opinion, at 33–36 (discussing the Fourth and Sixth's Circuits analyses of West Virginia and Ohio appellate court case law, respectively, as part of those Courts of Appeals' adjudication of COVID-19 business interruption insurance-related claims).

The Courts of Appeals' dismissal of the types of claims Plaintiffs assert in this case aligns with the majority of decisions, by both state courts and federal courts, that have been issued in COVID-19 business interruption insurance litigation since the COVID-19 pandemic began. *SeeCOVID-19 Case Tracker*, Law360 Insurance Authority (Aug. 29, 2022), https://www.law360.com/insurance-authority/covid-map; *COVID Coverage Litigation Tracker*, Univ. of Penn. Carey Law School: Insurance Law Center, https://cclt.law.upenn.edu/ (last visited Oct. 13, 2022).

Plaintiffs urge this Court to decide their claims differently, in alignment with the minority decisions, including those from several Pennsylvania Courts of Common Pleas. However, for the reasons explained next, the Court concludes based on the law that has developed prior to and since

---

[16] The intermediate appellate courts in Illinois and New York have dismissed policyholder claims related to business losses caused by COVID-19 and related government orders and in doing so relied on the same state court pre- COVID-19 pandemic cases that the Seventh and Second Circuits relied on in *Sandy Point* and *10012 Holdings*. *See Ark Rests. Corp. v. Zurich Am. Ins. Co.*, No. 1-21-1147, 2022 WL 2159012, at *4 (Ill. App. Ct. 2022); *Consolidated Rest. Operations, Inc. v. Westport Ins. Corp.*, 167 N.Y.S.3d 15, 19 (N.Y. App. Div. 2022).

the onset of the COVID-19 pandemic that Plaintiffs' claims cannot proceed further.

    **d.**  **Whether Plaintiffs Have Plausibly "Shown" in the CAC "Direct Physical Loss of or Damage to" Their Property that Triggers Coverage**

The near-uniform dismissal of claims like Plaintiffs' in the above-summarized cases presents an uphill path of precedent for Plaintiffs to surmount. It means that this Court should deny Cincinnati's Motion to Dismiss if it appears to this Court that it should discount those cases when predicting how the Pennsylvania Supreme Court would decide Plaintiffs' claims here or that those cases involved fundamentally different factual allegations or legal arguments than those that Plaintiffs have advanced here.

In *In re: Erie*, the Court concluded that the above-summarized cases were soundly decided and are reliable indicators of the path of the decisional law which this Court should follow as to how the highest courts of the jurisdictions involved in the MDL, including the Pennsylvania Supreme Court, would decide the issues raised in the actions in the MDL—most importantly, the meaning of "direct physical loss of or damage to" property and application of that phrase in the COVID-19 business interruption insurance litigation context. Erie Opinion, at 41–42.

The Court also concluded that the plaintiffs in the MDL actions had not pleaded factual allegations or advanced legal arguments that were materially different from such as pleaded or advanced by the plaintiffs in the above-summarized decisions and thus that those decisions were highly instructive in the Court's analysis of the MDL plaintiffs' claims and the Motion that sought to dismiss them. *Id.* at 42–43. The same is true as to Plaintiffs in this case; Plaintiffs have thus not demonstrated that this Court should decide their COVID-19 business interruption insurance claims any differently than how the majority of courts in the leading cases discussed above resolved nearly identical claims.

Like the MDL plaintiffs, Plaintiffs in this case have primarily advanced the claim that the

COVID-19 virus is a covered cause of loss because it is a physical substance that caused "direct physical loss of or damage" to Plaintiffs' properties. To support that claim, Plaintiffs have pleaded, as plaintiffs in the MDL pleaded, that COVID-19 virus particles were physically present on their properties,[17] that the particles altered the properties by bonding to surfaces and "becom[ing] part of th[ose] surface[s]," and that according to various studies, COVID-19 virus particles remain stable, transmittible, and/or infectious in air and on surfaces for a certain length of time, and according to one of those studies for up to nine days on certain surfaces. (ECF No. 88 ¶¶ 72–77, 113.)

But for the reasons that this Court explained in *In re: Erie*, those allegations cannot carry the day for Plaintiffs. Even considering on their own and accepting as true Plaintiffs' allegations that the virus particles can become affixed to and remain stable on surfaces for 3 or 4 hours or for 1, 2, 3, 9, or 14 days, and in that way "change" the surfaces (ECF No. 88 ¶¶ 74, 76, 77), the natural plausible inference from those allegations is that the virus particles dissipate on their own, after those hours or days have passed, without any human intervention and without any harm to physical property. Further, reading Plaintiffs' CAC as a whole requires the Court to also accept as true Plaintiffs' assertion in the CAC that "some cleaning products will both inactivate and remove COVID-19 from surfaces." (ECF No. 88 ¶ 75.) This assertion demonstrates that the virus particles can be readily removed, thus returning the property to its original condition, as soon as the property

---

[17] In describing the MDL CAC in *In re: Erie*, the Court noted that the facts that the plaintiffs had pleaded in an effort to show that COVID-19 was physically present on their particular properties—allegations that employees and/or customers of some of the plaintiffs had tested positive for or been exposed to COVID-19—were barely sufficient (if sufficient at all) to plausibly make that showing because they did not plausibly show that any person contracted COVID-19 from, or spread COVID-19 virus particles to, the plaintiffs' properties. There thus was no nexus plausibly shown between the fact that those individuals were infected and the COVID-19 virus actually being present on the property. Here, Plaintiffs have not gone that far; instead, Plaintiffs have only alleged that the COVID-19 virus was "ubiquitous," and that "[b]ased upon the available data, Plaintiffs believe and aver that COVID-19 was present on the premises of their Covered Properties by the time the Mandated Shutdown Rules were announced." (ECF No. 88 ¶¶ 110, 113.) These conclusory allegations are insufficient to plausibly show that COVID-19 virus particles were even present on Plaintiffs' properties, which constitutes an additional central shortcoming with Plaintiffs' allegations beyond those that the Court focuses on here.

owners themselves undertake simple remedial actions in advance of its natural dissipation.

Plaintiffs' pleadings as to (1) the relatively short amount of time that COVID-19 virus particles may alight and then remain on property on which they are found and (2) the ability for property owners themselves to use readily available cleaning products to "inactivate and remove" the virus particles from surfaces do not plausibly show that COVID-19 causes "direct physical loss of or damage to" property; rather, the pleadings show that COVID-19 is distinguishable from other physical substances that *can* cause such loss or damage despite not physically altering property. *See* Erie Opinion, at 49–51 (contrasting COVID-19 virus particles that have alighted on surfaces from gasoline that has infiltrated the soil underneath a property, asbestos fibers that have been released from a structure, *E.coli* contamination of a property's water supply, and ammonia that has been released into a property). And considered as a whole, Plaintiffs' assertions do not "show" "a distinct, demonstrable, and physical alteration" of the involved property, such that "its function is nearly eliminated or destroyed, or . . . made useless or uninhabitable," the test as articulated by the court in *Port Authority*. 311 F.3d at 235–36.

As explained in *In re: Erie*, Plaintiffs have not and cannot plausibly state a claim for entitlement to coverage under their Policies by emphasizing the danger that COVID-19 poses to human health and its ability to swiftly spread. The Court does not dispute Plaintiffs' characterization of the COVID-19 virus—like leaking gasoline, released asbestos fibers, *E.coli* contamination, or ammonia—as dangerous to those who encounter it; the virus has taken an immeasurable toll on *people* who have been infected. But the Court, like all who have lived through the COVID-19 pandemic, is also aware that a significant number of properties—whether it be grocery stores or hospitals that remained open throughout the pandemic to provide essential services—were (1) either as likely as Plaintiffs' properties to have been impacted by the same

COVID-19 virus, to the extent that the virus was allegedly present on Plaintiffs' properties and yet (2) never ceased to be fit to function or to be inhabited. *See Bookwalter*, 946 F.3d at 177 (citing *Iqbal*, 556 U.S. at 679) (requiring a court evaluating a motion to dismiss to "draw on its judicial experience and common sense").

Even assuming the presence of COVID-19 virus particles on such properties at which such businesses were operated (applying the Plaintiffs' logic), those properties continued to be used and as inhabitants of those properties employed other mitigation efforts that Plaintiffs identify in their CAC, like mask wearing, to reduce the impact of COVID-19 on those inhabitants. In short, the COVID-19 virus did not harm those properties in a way so as to generate a loss of or to the *property* itself, and Plaintiffs have not plausibly pleaded that the situation at their properties was any different.

Nor do Plaintiffs assertions about the Mandated Shutdown Rules demonstrate that COVID-19 rendered property so dangerous such that it was unusable and uninhabitable. The Mandated Shutdown Rules were not issued in response to COVID-19's confirmed presence at any of Plaintiffs properties—unlike government orders requiring asbestos abatement at a particular property at which asbestos fibers are present, for example. Plaintiffs' conclusory assertion that the COVID-19 virus must have been present on their properties because the virus was "ubiquitous" does not plausibly show that the Mandated Shutdown Rules were issued because of dangerous conditions on Plaintiffs properties—especially given Plaintiffs' own description of the Mandated Shutdown Rules as generally intended to minimize the spread of the virus (*e.g.*, ECF No. 88 ¶ 78 ("[O]n March 15, 2020, Governor Wolf announced that mitigation efforts were being put into place starting on March 16, 2020, that closed dining areas of restaurants and bars to help stop the spread of COVID-19.")).

Plaintiffs here rely on many of the same cases as did the MDL plaintiffs to argue that the meaning of "direct physical loss of or damage to" is ambiguous because there is another reasonable meaning of the phrase that does not require a physical alteration to property or loss of use that is so substantial that the property becomes uninhabitable or useless, but rather only requires some loss of intended use of property. For the reasons the Court explained in *In re: Erie*, those cases are not persuasive, either because they do not reasonably ascribe meaning to every term in the policies at issue, or because they stretch commercial property insurance policies beyond their purposes. Erie Opinion, at 51–53 (discussing *Ungarean, DMD v. CNA*, No. 20-6544, 2021 WL 1164836 (Pa. Com. Pl. Mar. 25, 2021) and *MacMiles LLC v. Erie Ins. Exchange*, No. 20-7753, 2021 WL 3079941 (Pa. Ct. Com. Pl. May 25, 2021)).[18]

For the reasons described above, and consistent with the Court's determination in *In re: Erie*, Plaintiffs have not plausibly pleaded that either the COVID-19 virus or the Mandated Shutdown Orders caused "direct physical loss of or damage to" their properties. Because Plaintiffs have not shown a "covered cause of loss," they have not shown that they were entitled to any of the coverage they claimed under their Cincinnati-issued Policies.

### e.   The Reasonable Expectations Doctrine

Plaintiffs argue that even if the terms of the Policies clearly and unambiguously preclude the coverage they have sought from Cincinnati, Pennsylvania's reasonable expectations doctrine

---

[18] In their Brief in Opposition to Cincinnati's Motion to Dismiss, Plaintiffs cite to *Intermetal Mexicana, S.A. v. Insurance Co. of North America*, 866 F.2d 71 (3d Cir. 1989), which plaintiffs in the MDL did not reference in their briefing as to the motion to dismiss those actions. But *Intermetal* is consistent with *Port Authority* and *Hardinger*. The court in *Intermetal* concluded that a policyholder's machinery that was taken pursuant to a court order constituted property that was "lost" under the policyholder's property insurance policy because the taking caused total dispossession of the property. 855 F.2d at 74–78. Thus, *Intermetal* does not impact this Court's conclusion, based in large part on *Port Authority* and *Hardinger*, that "direct physical loss of or damage to" property requires an impact to property that is so total as to require that the property be repaired, rebuilt, or replaced before it can be used again or as to render the property unusable for any purpose or uninhabitable, nor does it impact the Court's determination that Plaintiffs have not plausibly pleaded such loss or damage.

may entitle Plaintiffs to coverage based on their reasonable expectations of what types of losses

would be covered. However, as was the case in *In re: Erie*, the reasonable expectations doctrine

does not entitle Plaintiffs to relief. *See* Erie Opinion, at 54–56 (concluding that the MDL plaintiffs

had not plausibly pleaded entitlement to insurance coverage under the reasonable expectations

doctrine).

The district court in *Penn Asian Services v. Selective Insurance Co. of South Carolina*

summarized Pennsylvania's reasonable expectations doctrine:

> In Pennsylvania, insurers cannot orally promise one thing and then hand over a
> cumbersome written contract that says another. *Collister v. Nationwide Life Ins.
> Co.*, 388 A.2d 1346, 1353 (Pa. 1978). If insurers "abuse their position" and "create[
> ] in the insured a reasonable expectation of coverage," "that expectation will prevail
> over the language of the policy." *Bensalem Twp. v. Int'l Surplus Lines Ins. Co.*, 38
> F.3d 1303, 1311 (3d Cir. 1994). For expectations to control, the insurers must
> engage in some sort of misconduct, like "actively providing misinformation about
> the scope of coverage" or "failing to notify the insured of changes in the policy."
> *Id.* at 1312. Plus, of course, the insured's expectation must be "reasonable."
> *Collister*, 388 A.2d at 1354.

No. 20-4919, 2021 WL 4478215, at *5 (E.D. Pa. Sept. 30, 2021).

Plaintiffs assert that they "reasonably expected the Policies to cover their loss of use arising

from the COVID-19 pandemic" for three reasons: (1) "had Cincinnati wanted to limit coverage to

'a physical alteration' of the Covered Property, it could have issued a policy providing coverage

only in the event of 'physical injury to tangible property,'" but "Cincinnati did not"; (2) "Cincinnati

could have included a virus exclusion in Plaintiffs' Policies," as other insurance companies issuing

other policies have done, but "Cincinnati did not"; and (3) Cincinnati did not adequately "dispel

any notion or expectation on the part of the Plaintiffs and Class members that the 'all-riffs' policies

at issue would in fact provide coverage for only certain losses and events." (ECF No. 99, at 29–

31.) Cincinnati argues that the reasonable expectations doctrine "is applied only 'in very limited

circumstances,' such as where an insurer unilaterally changes the terms of the contract or engages

in other underhanded behavior at the expense of the insured," and that Plaintiffs have not plausibly pleaded that Cincinnati engaged in this type of conduct. (ECF No. 103, at 15–16.)

The Court concludes that Plaintiffs have not plausibly pleaded facts to support application of the reasonable expectations doctrine in this case. First, Plaintiffs have not plausibly pleaded misconduct by Cincinnati. As explained above, the language in Cincinnati's Policies clearly and unambiguously require either a structural alteration to property or a non-structural impact that otherwise renders the property unusable or uninhabitable, so Cincinnati has not attempted to give Plaintiffs a false expectation that anything else would result in coverage. That Cincinnati in theory could have used some other arguably clearer language is no indication that Cincinnati has engaged in any misconduct. *See* Erie Opinion, at 55 (quoting *Santo's Italian Cafe LLC v. Acuity Ins. Co.*, 15 F.4th 398, 401 (6th Cir. 2021)) ("'[T]here is indeed nothing common about the language of insurance contracts. Then again, there is nothing common about the task at hand—capturing risk and what to pay for it, pricing unknowable future perils in a fair and predictable way. This is a specialized field of language, and aptly so.' For that reason, . . . [employing] 'technical . . . coverage and exclusion language' is not nefarious—it is part and parcel of administering coverage issues in the insurance context.").

Cincinnati's position in its Motion to Dismiss that its Policies do not cover losses resulting from the COVID-19 pandemic despite the Policies' lack of a virus exclusion also does not amount to misconduct on the part of Cincinnati. Several courts have rejected the argument that lack of a virus exclusion in an insurance policy means that the policy covers virus-related losses. *See, e.g.*, *Kim-Chee LLC v. Phila. Indem. Ins. Co.*, No. 21-1082, 2022 WL 258569, at *2 (2d Cir. Jan. 28, 2022) ("Kim-Chee's policy does not contain a virus exclusion. Thus, Kim-Chee argues, the policy must cover losses 'caused by or resulting from' the coronavirus. We disagree. '[T]he absence of

an exclusion cannot create coverage; the words used in the policy must themselves express an intention to provide coverage . . . .' Because Kim-Chee 'never established its initial entitlement to coverage, we need not consider what consequences for that coverage might have arisen from the virus exclusion.' Kim-Chee has not shown it suffered a covered loss under its insurance policy, and the absence of the virus exclusion does not alter this conclusion." (alterations in original) (citations omitted)); *Sweet Berry Cafe, Inc. v. Soc'y Ins., Inc.*, 193 N.E.3d 962, 975 (Ill. App. Ct. 2022) ("[The plaintiff] also notes that Society's policy did not contain a virus exclusion. We conclude that this is of no import here. Unless the policy already granted coverage, which it does not do, a virus exclusion was not necessary. Further, the absence of an exclusion cannot "'create an ambiguity in an otherwise unambiguous insuring clause.'"), *appeal denied*, 2022 IL 128399 (Ill. Sept. 28, 2022); *Sanzo Enterprises, LLC v. Erie Ins. Exch.*, 182 N.E.3d 393, 406 (Ohio Ct. App. 2021) ("[T]he absence of a virus exclusion in the policy does not impact the meaning of the phrase 'direct physical loss of or damage to property.'"). This Court agrees that by not including a virus exclusion in its Policies, Cincinnati did not represent to Plaintiffs that virus-related losses are covered under the Policies.

The Court also concludes that Plaintiffs did not have a reasonable expectation of coverage based on the "all risks" nature of the Policies. That the Policies are "all risk" policies does not mean that an expectation of coverage for any event that can be argued in litigation to be a covered cause of loss under the Policies is reasonable. *See Port Auth.*, 311 F.3d at 234 ("[I]n the insurance industry, 'all risks' does not mean 'every risk.'").

Thus, Plaintiffs have not plausibly pleaded coverage under their Policies under the reasonable expectations doctrine.[19]

---

[19] In its Motion to Dismiss, Cincinnati only argues that Plaintiffs' claimed losses are not covered, and does not argue in the alternative that even if the Court concludes they are covered losses, the Court should find that the losses are

VI.    **CONCLUSION**

As the Court observed in its Erie Opinion, the COVID-19 pandemic has had detrimental consequences to people all over the world that cannot be overstated. Nevertheless, for the reasons explained above, the Court concludes that the Plaintiffs have not plausibly pleaded that they are entitled to coverage under the Cincinnati Policies for the additional property loss consequences that Plaintiffs assert they suffered as a result of the pandemic and the associated government orders limiting how the properties could be used.

The Court further concludes that, given the basis for the Court's decision here, the Plaintiffs could not amend their CAC to allege additional facts or law that would plausibly show that they are entitled to such coverage. Thus, any amendment to the CAC would be futile. *In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1434 (3d Cir. 1997) (recognizing that leave to amend is properly denied where "any attempted additional amendment of [the] pleading would be futile"); *see also LabMD Inc. v. Boback*, 47 F.4th 164, 192–93 (3d Cir. 2022) (stating that a "District Court [is] not obligated to grant leave to amend of its own accord" in non-civil rights cases). The Court will therefore GRANT Cincinnati's Motion to Dismiss (ECF No. 95), and these actions will be dismissed with prejudice.

An appropriate Order will issue.

s/Mark R. Hornak
Mark R. Hornak
Chief United States District Judge

Dated: October 24, 2022
cc:      All counsel of record (via CM/ECF)

---

excluded under the Cincinnati Policies' "ordinance or law" exclusion, which states that "[Cincinnati] will not pay for 'loss' caused directly or indirectly by . . . the enforcement of or compliance with any ordinance or law: [] [r]egulating the construction, use[,] or repair of any building or structure; or [] [r]equiring the tearing down of any building or structure, including the cost of removing its debris." (ECF No. 89, at 32.) The Court therefore does not address or resolve that question in these actions.